IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

| | | |
|---|---|---|
| RYAN LANG, on behalf of himself and all others similarly situated, | ) ) ) | |
| *Plaintiff,* | ) ) | CA No. 7:18-cv-00077-BO |
| v. | ) ) ) | |
| DUPLIN COUNTY, | ) ) | |
| *Defendant.* | ) | |

## PLAINTIFF'S UNOPPOSED MOTION TO APPROVE FLSA SETTLEMENT AGREEMENT, INCLUDING AWARD OF ATTORNEYS' FEES AND COSTS, SERVICE AWARD, AND INCORPORATED MEMORANDUM IN SUPPORT

Plaintiff Ryan Lang, on behalf of himself and others similarly situated, with the consent of Defendant Duplin County, moves this Court for an order approving the parties' FLSA Settlement Agreement (attached as Exhibit A), and approving as reasonable the Settlement Agreement's proposed award of attorneys' fees and costs, and service award. In support of this motion, the parties state as follows:

## I.   CASE BACKGROUND

Plaintiff filed this federal Fair Labor Standards Act ("FLSA") collective action lawsuit on May 11, 2018, alleging that he and other paramedics, Emergency Medical Technicians (EMTs), and Intermediates employed by Defendant were unlawfully denied overtime premiums pursuant to Defendant's unlawful misclassification of their position as FLSA "exempt." *See* Dkt. No. 1.  Defendant thereafter filed a Motion to Dismiss for Failure to State a Claim on July 13, 2018. *See* Dkt. No. 12.  In response, Plaintiff filed an Amended

Complaint curing deficiencies presented in Defendant's motion on July 25, 2018. *See* Dkt. No. 19. Defendant then filed a new Motion to Dismiss for Failure to State a Claim on August 8, 2018; and an Answer to the Amended Complaint on September 6, 2019. *See* Dkts. No. 23, 30. Defendant subsequently filed a Motion for Partial Judgment on the Pleadings on January 3, 2019, seeking to dismiss Plaintiff's state law claims against Defendant, to which Plaintiff did not object and this Court subsequently granted on February 4, 2019. *See* Dkts. No. 35, 43.

On March 28, 2019, Plaintiff moved both for leave to file a Second Amended Complaint and for certification of a collective action pursuant to § 216(b) of the FLSA, which Defendant did not oppose. *See* Dkts. No. 51, 52. This Court granted both of Plaintiff's motions on April 5, 2019. *See* Dkts. No. 54, 55. Defendant then filed its Answer to Plaintiff's Second Amended Complaint on May 7, 2019. *See* Dkt. No. 59.

Plaintiff sent notice to the certified collective of "all individuals who were, are, or will be employed by Defendant as full-time Emergency Medical Personnel, including but not limited to, Paramedics, Emergency Medical Technicians – Basic, and Emergency Medical Technicians – Intermediates, at any time within the three (3) year period prior to joining this lawsuit under 29 U.S.C. § 216(b) and who did not receive compensation for all hours worked, including one and one half times their regular rate for all hours worked over forty (40) in a week." (Declaration of Gilda A. Hernandez, "Hernandez Decl.", attached as Exhibit B, ¶ 25. A total of 66 full-time Emergency Medical Personnel, including Plaintiff Ryan Lang, submitted timely consents to join this litigation. (Hernandez Decl., ¶ 25).

On August 8, 2019, Magistrate Judge Robert T. Numbers, II issued a Scheduling

Order requiring the parties to "participate in a mediated settlement conference on or before September 27, 2019" and directing the parties to report to this Court the result of the mediation on or before October 18, 2019. *See* Dkt. No. 70. Pursuant to the Scheduling Order, the parties participated in an all-day mediation with mediator Kenneth P. Carlson, Jr. on September 27, 2019, in Cary, North Carolina. (Hernandez Decl., ¶ 27). In connection with the impending mediation, Defendant produced information regarding each Opt-in Plaintiff's salary, work weeks, and other relevant information, sufficient to enable Plaintiff and his counsel to fully and fairly value Plaintiff's and the Opt-in Plaintiffs' claims. (Hernandez Decl., ¶ 27). Plaintiff and his counsel also conducted a comprehensive investigation and evaluation of the facts and law relating to the claims asserted in the Lawsuit, including interviewing Opt-in Plaintiffs regarding their work hours, education and training, and job duties. (Hernandez Decl., ¶ 27).

While the parties did not reach a resolution at the conclusion of the mediation, they continued to engage in intense back-and-forth negotiations over the next eleven (11) days and finally came to a resolution on October 8, 2019, which resulted in the parties' Settlement Agreement. (Hernandez Decl., ¶ 27). In light of the costs, risks, and delay of continued litigation balanced against the benefits of settlement, Plaintiff and his counsel believe this Settlement Agreement is in the best interests of Plaintiff and each of the Opt-in Plaintiffs and represents a fair, reasonable, and adequate resolution of the claims in the Lawsuit. (Hernandez Decl., ¶¶ 31-32). Defendant denied and continues to deny Plaintiff's allegations in the Lawsuit. Nonetheless, without admitting any liability or responsibility for damages, Defendant has agreed to settle the Lawsuit on the terms and conditions set

3

forth in this Agreement to avoid the burden, expense, and uncertainty of continuing litigation.

## II. <u>SUMMARY OF SETTLEMENT TERMS</u>

The Settlement Agreement is attached hereto as Exhibit A, and the Court is respectfully referred thereto for the complete terms and conditions of the settlement. However, by way of summary, the key settlement terms include:

**A. Gross Settlement Fund**

- Defendant shall remit a Gross Settlement Fund amount equal to $495,000.00;

**B. Special Payments to Named Plaintiffs**

- Named Plaintiff Ryan Lang will receive a Service Award in the amount of $15,000 for the work he performed litigating this case on behalf of the collective;

**C. Payment of Costs and Attorneys' Fees**

- The attorneys' fee portion of the Gross Settlement Fund amount will be equal to the sum of $165,000 (e.g. 33.33%);

**D. Method of Payments**

- Each Participating FLSA Collective Member will be entitled to receive a share of the Net Settlement Amount, proportionate to their estimated actual damages as compared to the total estimated damages for the entire collective. Specifically, funds will be allocated on a pro rata basis.

4

Individual Settlement Amounts will only be distributed to Participating FLSA Collective Members who have submitted a valid and timely Consent Form;

**E.     Release**

- The FLSA Collective Members will release their federal, state, and local wage claims though the Effective Date, subject to Court approval;

**F.     Additional Terms**

- Defendant Duplin County will change its overtime pay practices with respect to all full-time Emergency Medical Personnel employees pursuant to an hourly basis versus a non-exempt salaried basis, and it will pay time and a half for all hours worked over 40 in a workweek; and

- This action shall be dismissed, with prejudice.

## III.     <u>ARGUMENT</u>

**A.     This Court Should Approve the Parties' Settlement.**

The FLSA provides that "[a]ny employer who violates the provisions of section 206 or 207 of this title shall be liable to the employee . . . affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation." 29 U.S.C. § 216(b). The FLSA's provisions are mandatory and, except in two narrow circumstances, generally are not subject to bargaining, waiver, or modification by contract or private settlement. *Brooklyn Sav. Bank v. O'Neil,* 324 U.S. 697, 706 (1945). The two limited circumstances in which FLSA claims may be compromised are (1) when the Secretary of Labor

5

supervises the settlement pursuant to 29 U.S.C. § 216(c), or (2) when a court reviews and approves a settlement in a private action for back wages under 29 U.S.C. § 216(b). *Lynn's Food Stores, Inc. v. United States, U.S. Dep't of Labor*, 679 F.2d 1350, 1353 (11th Cir. 1982); *see also Taylor v. Progress Energy, Inc.*, 493 F.3d 454, 460-61, 463 (4th Cir. 2007), *reinstating* 415 F.3d 364 (4th Cir. 2005) (discussing need for prior approval from court or Department of Labor of any waiver or release of FLSA claims).

Although the Fourth Circuit has not set forth specific guidelines for approval of an FLSA settlement, district courts within the Fourth Circuit have held that settlement of FLSA claims must be presented to the court for review and determination whether the settlement is fair and reasonable. *See In re: Dollar General Stores FLSA Litigation*, 5:09-MD1500, 2011 WL 3904609, at *2 (E.D.N.C. Aug. 22, 2011). For the Court to approve an FLSA settlement, the Court must find that the litigation involves a bona fide dispute and that the proposed settlement is fair and equitable to all parties. *See Kirkpatrick v. Cardinal Innovations Healthcare Sols.*, 352 F. Supp. 3d 499, 502 (M.D.N.C. 2018). Further, the settlement agreement must contain an award of reasonable attorneys' fees. *See id*. at 503-04.

The standard for court approval is straightforward: a district court should approve a fair and reasonable settlement if it was reached at an arm's length resolution of contested litigation to resolve a bona fide dispute under the FLSA. *See Hall v. Higher OneMachines, Inc.*, 2016 WL 5416582, *6–7 (E.D.N.C. Sept. 26, 2016). First, the court must be satisfied that the settlement was the product of a bona-fide dispute. *Id*. Second, the court must inquire as to whether the settlement is fair and reasonable. *Id*. Based upon the contested

nature of this case and the quality of the settlement, Plaintiff respectfully submits that this Court should conclude that the parties' settlement is a reasonable arms'-length resolution of a *bona fide* dispute in contested litigation and thus approve the settlement.

1. *The Proposed Settlement is the Product of a Bona Fide Dispute.*

A bona fide dispute is "one in which there is some doubt whether the plaintiff would succeed on the merits at trial." *See Hall*, 2016 WL 5416582, at *6 (citing *Lynn's Food Stores, Inc.*, 679 F.2d at 1354). To determine if a bona fide dispute exists, courts "examine the pleadings in the case, along with the representations and recitals in the proposed settlement agreement." *See Hall*, 2016 WL 5416582, at *6 (citing *Amaya Amaya v. Young & Chang, Inc.,* No. PWG-14-749, 2014 WL 3671569, at *5 (D. Md. July 22, 2014).)).

Unquestionably, the proposed settlement is the product of a bona fide dispute. In his Original and Amended Complaint, Plaintiff made detailed, factual allegations describing Defendant's alleged unlawful compensation practices. Defendant filed its Answer denying all of Plaintiff's material factual allegations and asserting an array of affirmative defenses that it argued would bar Plaintiff's claims in whole or in part. The parties conducted extensive factual investigations regarding the issues raised in Plaintiff's Amended Complaint and Defendant's Answer. Plaintiff's counsel interviewed many of Defendant's current and former employees, compared their findings, reviewed voluminous documents, and analyzed their pay and time records. (Hernandez Decl., ¶ 27). Additionally, the parties exchanged written discovery, and Defendant analyzed its records and interviewed its own witnesses to evaluate the veracity of Plaintiff's allegations and

7

negate such claims. The parties also undertook considerable legal analysis of the various issues implicated in this case, including fully analyzing the issues pertaining to FLSA conditional certification. (Hernandez Decl., ¶¶ 49-50). Indeed, prior to commencing and throughout mediation, the parties exchanged and discussed the caselaw that each party felt was relevant to this matter. (Hernandez Decl., ¶ 27).

The settlement of this lawsuit occurred during an intense and adversarial mediation, the negotiations of which spanned over eleven days. (Hernandez Decl., ¶ 27). That is, the parties were only able to reach an agreement after considerable time invested in exploring the issues and supporting legal authorities of both sides. *Id.* Thus, before the settlement, the parties had a full opportunity to analyze the pertinent factual and legal issues and assess the strengths and weaknesses of the claims and defenses at issue. (Hernandez Decl., ¶ 27). Accordingly, this Court should readily conclude that the proposed settlement was the product of a bona fide dispute.

### 2. *The Settlement is Fair and Reasonable.*

Although district courts have broad discretion in approving the settlement of an FLSA case, there is a "strong presumption in favor of finding a settlement fair." *See Kirkpatrick*, 352 F. Supp. 3d at 502; *see also In re BankAmerica Corp. Securities Litig.*, 210 F.R.D. 694, 700 (E.D. Mo. 2002) ("In evaluating the settlement, the Court should keep in mind the unique ability of class and defense counsel to assess the potential risks and rewards of litigation; a presumption of fairness, adequacy and reasonableness may attach to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery") (citations omitted). The Fourth Circuit has not

addressed how courts are to analyze whether a proposed FLSA settlement is "fair and reasonable." *See id.* However, District courts within the Fourth Circuit have held that to determine whether a settlement is fair and reasonable, courts should consider "(1) the extent of discovery that has taken place; (2) the stage of the proceedings, including the complexity, expense and likely duration of the litigation; (3) the absence of fraud or collusion in the settlement; (4) the experience of counsel who have represented the plaintiffs; (5) the opinions of counsel; and (6) the probability of plaintiffs' success on the merits and the amount of the settlement in relation to the potential recovery." *Duprey v. Scotts Co. LLC*, 30 F. Supp. 3d 404, 409 (D. Md. 2014); *Patel v. Barot*, 15 F. Supp. 3d 648, 655-56 (E.D.V.A. 2014) (same); *Irvine v. Destination Wild Dunes Mgmt., Inc.*, 204 F. Supp. 3d 846, 849 (D.S.C. 2016) (same).

In this matter, as provided below, the six factors discussed in *Duprey*, *Patel*, and *Irvine* all support a showing that the proposed settlement is fair and reasonable.

a) <u>The Extent of Discovery that has Taken Place</u>

In assessing the first factor, the *Duprey* court held that "although formal discovery has not commenced, the parties represent that they have engaged in informal discovery . . . . By avoiding formal discovery, resources that otherwise would have been consumed by the litigation were made available for settlement, and the risk and uncertainties for both parties were reduced." *Duprey*, 30 F. Supp. 3d at 409. Ultimately, the appropriate question is "whether counsel had an adequate appreciation of the merits of the case before negotiating." *In re Warfarin*, 391 F.3d 516, 537 (3d Cir. 2004).

In this matter, the parties have engaged in significant discovery. On September 24,

2018, Plaintiff served Defendant with interrogatories and requests for production of documents, and Defendant has produced over 20,000 documents related to payroll, personnel records, and its compensation policies as well as payroll data for plaintiffs and opt ins during the relevant time period. This extensive document production allowed for an evaluation of Plaintiffs' claims and the calculation of damages. Counsel is thus in a strong position to negotiate a fair settlement and advise the Plaintiffs of the advantages and disadvantages of litigating through trial. This factor thus weighs in favor of preliminary approval. *See Hood v. Uber Techs., Inc.*, 2019 WL 93546 at *5 (M.D.N.C. Jan. 3, 2019) (finding that the exchange of a 322,215-line spreadsheet and reviewing summary judgment records in parallel lawsuits over the same issue, without conducting formal discovery, was sufficient to "allow [] the parties to adequately assess the claims and defenses.").

b) <u>The Stage of the Proceedings, Including the Complexity, Expense and Likely Duration of the Litigation</u>

In assessing the second factor, the *Irvine* court provided that a district court must "determine whether proceedings have progressed to a stage 'sufficient to permit the parties and their counsel to obtain and review evidence, to evaluate their claims and defenses and to engage in informed arms-length settlement negotiations with the understanding that [trial] would be a difficult and costly undertaking.'" *Irvine*, 204 F. Supp. 3d at 849-850 (citation omitted). The *Duprey* court found that a case was sufficiently complex because of the steps required in calculating the plaintiff's overtime damages. *See Duprey*, 30 F. Supp. 3d at 409.

In this matter, as provided above, the parties engaged in extensive discovery prior to and during mediation. Additionally, Plaintiff's counsel conducted in-depth interviews of the majority of Named and Opt-in Plaintiffs prior to and following the filing of the Complaint; collected and reviewed payroll documentation, to determine the extent of the U.S. Department of Labor's ("USDOL's") investigation of Defendant and overall investigative findings; and, following the in-depth interviews conducted with Named and Opt-in Plaintiffs, utilized that information and performed thorough and complex calculations to determine the damages for each opt-in plaintiff in this action. Further, with respect to the likely duration of the litigation, the parties believe that if they proceeded with the instant collective action, including through discovery, dispositive motions, trial, and potentially appeal, the action could have lasted years, and doing so would have posed substantial risks. Accordingly, this factor weighs in favor of approving the proposed settlement.

c)      The Absence of Fraud or Collusion in the Settlement

As stated by the *Irvine* court, "[a]bsent any evidence of fraud or collusion, the Court presumes none occurred." *Irvine*, 204 F. Supp. 3d at 850. Likewise, "[w]here negotiations are conducted at arms-length and in the presence of both counsel and an experienced mediator, there is a presumption that the settlement they achieved meets the requirements of due process." *See Matthews v. Cloud 10 Corp.*, No. 3:14-cv-00646, 2015 U.S. Dist. LEXIS 114586, at *4 (W.D.N.C. Aug. 27, 2015).

Here, the settlement was reached via arm's-length, multi-day negotiations, conducted in the presence of counsel and with the assistance of an experienced, neutral

third-party mediator. There is no evidence whatsoever of any coercion, fraud, or collusion or any other improper dealing that would lead to a finding that the negotiations were in any way unfair.

d)     <u>The Experience of Counsel Who Have Represented the Plaintiffs</u>

With respect to the fourth factor, according to the *Patel* court, the extent of counsel's experience, and whether counsel has experience litigating FLSA claims, in particular, support approving a proposed settlement. *See Patel*, 15 F. Supp. 3d at 656.

Counsel for Plaintiffs has substantial experience prosecuting large-scale wage and hour class and collective actions, including several cases involving hundreds or thousands of class members, employees misclassified as exempt, inappropriate calculations of overtime, and employees subject to improper overtime rates. *See* Hernandez Decl. ¶¶ 8-9. Collective Counsel's skill and experience litigating wage and hour cases undoubtedly contributed to obtaining the settlement in this case.

e)     <u>The Opinions of Counsel</u>

In assessing the fifth factor, the *Irvine* court afforded some weight to the opinion of the Plaintiffs' counsel, as exhibited by their submission of the motion for approval, and by the approval of the settlement by the plaintiffs, in determining fairness and reasonableness. *See Irvine*, 204 F. Supp. 3d at 850.

In this matter, Plaintiffs' counsel believe, in their experience, as noted above, that the proposed settlement is both fair and reasonable. Plaintiffs' counsel believe that the proposed settlement is in the best interest of Plaintiffs, particularly in light of the

12

substantial risks of continued litigation. Accordingly, this factor weighs in favor of approving the proposed settlement.

"In complex, multi-year [litigation], the risks inherent in the litigation are immense." *In re MI Windows & Doors Prods. Liab. Litig.*, 2015 U.S. Dist. LEXIS 95889, at *8 (D.S.C. July 23, 2015) (citations omitted); *Brown v. Delhaize Am., LLC*, 2015 U.S. Dist. LEXIS 184265, at *5 (M.D.N.C. July 20, 2015) (same). Indeed, "settlement must be evaluated taking into account the uncertainty and risks involved in litigation and in light of the strength of the claims and possible defenses." *In re MI Windows*, 2015 U.S. Dist. LEXIS 184471, at *38 (citations omitted). A court should consider "the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation. *Id.* (citations omitted).

A trial on the merits would involve significant risks for Plaintiffs. The Plaintiffs will have to overcome Defendant's position that Plaintiffs were properly compensated pursuant to a fluctuating workweek, salary, and overtime was properly paid for hours over 40 per week. Although the Plaintiffs are confident that they could prevail on liability, Plaintiffs are also realistic and recognize the inherent risks. Even if Plaintiffs prevail, this victory could only be obtained after extensive briefing and argument of an uncertain duration, and the process of trial and appellate litigation is always full of uncertainty. These factors thus weigh very strongly in favor of approval.

f)      The Probability of Plaintiffs' Success on the Merits and the Amount of the Settlement in Relation to the Potential Recovery

In reviewing a proposed settlement, courts weigh "the immediacy and certainty of substantial settlement proceedings against the risks inherent in continued litigation." *Brunson v. Louisiana-Pac. Corp.*, 818 F. Supp. 2d 922, 926 (D.S.C. 2011). Settlement offers relief and certainty, while, "[i]n contrast, continued litigation risks the possibility of little or no recovery." *Id.* Further, "[i]t is not . . . to be assumed that a settlement is unfair or unreasonable because . . . the settlement may only amount to a fraction of the potential recovery." *In re A.H. Robins Co.*, 880 F.2d 709, 748 (4th Cir. 1989).

In this matter, although Plaintiffs believe their case is strong, they recognize that it is subject to considerable risk. Among other things, Plaintiffs recognize the risk of not prevailing on Defendant's dispositive motions. Unfortunately, the risk of losing on this issue, after months of litigation, and if no resolution could be reached with Defendant, could preclude Plaintiffs from recovering *anything*. Similarly, the risk of maintaining collective certification through trial, is also present. There is also no guarantee that the Court will award liquidated damages in this matter. *See id.*

Based on Plaintiffs' estimate that approximately $1,518,172.70 (this amount is for *three* years pursuant to a claim of Defendant's alleged willfulness under the FLSA, which had not yet been litigated and also due to a time and one-half calculation as opposed to half-time calculation for hours over 40 per week; thus, these are not automatic certainties) represents Plaintiffs' damages, but only, if they were to prevail on all of their claims. As such, $495,000 is a reasonable settlement, particularly when factoring the uncertainties

14

of litigation. Defendant, of course, has asserted throughout litigation that EMTs have been paid all wages due. If Defendant were to prevail, even simply on the measure of damages, establishing that EMTs were owed overtime compensation under the FLSA, and Defendant properly calculated the overtime due, Plaintiffs' estimated damages would be reduced to an amount that is substantially less than the current settlement amount. And of course, if Defendant prevailed in a motion to decertify the collective, far fewer individuals' damages would be at issue. Given this risk to Plaintiff and Opt-ins/Current Participants, this settlement is beneficial in that it provides a guaranteed monetary recovery for FLSA opt-ins whose claims are within the statute of limitations period , that is potentially more generous than if the parties litigated this issue, as in no event shall any settlement funds revert to the Defendant. Thus, the settlement amount here far exceeds the mere fraction of possible damages that has been approved in other cases in this Circuit.

## B. This Court Should Approve the Requested Service Award.

Though courts in the Fourth Circuit have not provided clear guidance on specific factors to consider when assessing the reasonableness of a service award, courts in the Fourth Circuit acknowledge that plaintiffs play a crucial role in bringing justice to those who would otherwise be hidden from judicial scrutiny. *See, e.g., Burke v. Shapiro, Brown & Alt,* LLP, 2016 U.S. Lexis 65120, at *17 (E.D. Va. May 17, 2016) (noting the lack of factor test in the Fourth Circuit but quoting the common practice of considering "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefited from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation"); *Helmick v. Columbia Gas Transmission*, 2010 U.S. Dist. LEXIS

65808, at *8 (S.D. W. Va. July 1, 2010) ("Incentive awards are routinely approved in class actions to encourage socially beneficial litigation by compensating named plaintiffs for their expenses on travel and other incidental costs, as well as their personal time spent advancing the litigation on behalf of the class and for any personal risk they undertook.")

Because of the importance plaintiffs bring to class and collective actions, "an incentive award is appropriate . . . to induce an individual to participate in the suit." *See Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 690 (D. Md. 2013). Service awards fulfill the important purpose of compensating plaintiffs for the time they spend and the risks they take. *See Kirkpatrick*, 2018 WL 6718948, at *5 (M.D.N.C. Dec. 18, 2018) ("Service payments for named [p]laintiffs 'compensate [p]laintiffs for their additional efforts, risks, and hardships they have undertaken as class representatives on behalf of the group in filing and prosecuting the action.'"); *Leigh v. Bottling Grp., LLC*, 2012 U.S. Dist. LEXIS 17016, at *20 (D. Md. Feb. 10, 2012) ("[T]he policy underlying the FLSA – namely, 'to protect certain groups of the population from substandard wages and excessive hours which endangered the national health and well-being and the free flow of goods in interstate commerce,' would appear to be served by providing a modest incentive to plaintiffs who take such initiative and assume such risk.") (citing *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706 (1945)); *Archbold v. Wells Fargo Bank, N.A.*, 2015 U.S. Dist. LEXIS 92855, at *14 (S.D. W. Va. July 13, 2015) (acknowledging "[h]ad the [p]laintiff not stepped forward to prosecute these claims, the rest of the class would have received nothing"); *Hoffman v. First Student, Inc.*, 2010 U.S. Dist. LEXIS 27329, at *11 (D. Md. Mar. 23, 2010) (assessing, in an FLSA collective/class action, "the actions the plaintiff has taken to protect the interests

of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation," when determining whether a service award is warranted).

Courts have recognized that the time and dedication an individual devotes to a lawsuit that inures to the common benefit of others warrants a service award above-and-beyond what the typical class member receives. *See, e.g.*, *Helmick v. Columbia Gas Transmission,*, 2010 WL 2671506 at *3 (S.D. W. Va. July 1, 2019) (approving a $50,000 service award to one plaintiff in a settlement of $450,000); *Kirkpatrick*, 352 F.Supp.3d at 507-08 (approving $10,000 service award in an FLSA collective action); *DeWitt v. Darlington Cty.*, 2013 U.S. Dist. LEXIS 172624, at *39-40 (D.S.C. Dec. 6, 2013) (listing FLSA cases granting service awards and referring to such awards as "very common"); *Leigh v. Bottling Grp., LLC*, 2012 U.S. Dist. LEXIS 17016, at *20 (D. Md. Feb. 10, 2012) (granting $67,500 in service awards among several plaintiffs, where the average service award equaled $9,600); *Hatzey v. Divurgent, LLC.*, No. 2:18CV191, 2018 WL 5621967 (E.D. Va. Oct. 30, 2018) (approving $10,000 service award for named plaintiff); *McLaurin v. Prestage Foods, Inc.*, No. 7:09-CV-100-BR, 2012 WL 12910993, at *2 (E.D.N.C. Feb. 3, 2012) (granting service awards of $10,000 and $5,000). In fact, District Courts often approve higher service awards in the context of class and collective action litigation. *See Tussey v. ABB, Inc.*, 06-04305-CV-C-NKL, 2012 WL 5386033 (W.D. Mo. Nov. 2, 2012) (approving $25,000 service awards for the three class representatives); *see also Wolfert v. UnitedHealth Group, Inc.,* No. 4:08CV01643(TIA), at *4 (E.D. Mo. Aug. 21, 2009) (approving an incentive award of $30,000). Accordingly, this Court should approve the

modest service payment requested in this case as a reward for Plaintiff's contributions to the case and to the Class recovery as a whole.

Here, the parties' Settlement Agreement provides for a Service Award of $15,000 for Named Plaintiff Ryan Lang, who assumed substantial and inherent risks in becoming Named Plaintiff, and provided invaluable service to Collective Counsel and, ultimately, the Collective Members.  (Hernandez Decl., ¶ 51-52). Named Plaintiff has worked with Collective Counsel for approximately two years both before and throughout this litigation, to pursue these claims on behalf of Collective Members.  (Hernandez Decl., ¶ 48-52). Named Plaintiff was instrumental in providing documents relating to the compensation practice, and responding to questions prior to filing the complaint, during the litigation and mediation.    This has served as a considerable advantage for Plaintiffs. (Hernandez Decl., ¶ 48-52). He provided necessary evidence for the Court in support of the conditional certification motion and assisted Collective Counsel in the lengthy discovery process to prepare for the mediation.  *Id.*  Named Plaintiff also responded to written discovery requests and served as a contact person for Collective Members requesting updates and information about the status of this lengthy litigation.  (Hernandez Decl., ¶ 48-52). He educated Collective Counsel on many of Defendant's documents, policies, and practices, and this service enabled Collective Counsel to direct its discovery efforts and, in turn, obtain the best settlement result possible for all Collective Members.  (Hernandez Decl., ¶ 48-52).  The requested payment rewards Plaintiff for his service to the collective as a whole, which Collective Counsel estimates required over 100 hours of time. Without Named Plaintiff stepping forward to put his name on the lawsuit and his assistance over

the course of two years, it is unlikely that any recovery would have been as beneficial to the group. *Id.*

The requested service award for Named Plaintiff amounts to about 3% of the total recovery, which is a reasonable and typical percentage in the Fourth Circuit, especially in light of the active role Named Plaintiff assumed throughout the course of litigation. *See, e.g., Kay Co. v. Equitable Prod. Co.*, 749 F. Supp. 2d 455, 473 (S.D. W. Va. 2010) (emphasizing the importance of plaintiffs' sitting for depositions and participating in the discovery process); *Irvine v. Destination Wild Dunes Mgmt., Inc.*, 204 F. Supp. 3d 846, 848 (D.S.C. 2016) (approving service awards that amounted to 6.59% of the gross settlement amount); *DeWitt*, 2013 U.S. Dist. LEXIS 172624, at *40 (approving service awards that amounted to 3.33% of the gross settlement amount); *Faile v. Lancaster Cty.*, 2012 U.S. Dist. LEXIS 189610, at *42 (D.S.C. Mar. 8, 2012) (approving service awards that amounted to 4.5% of the gross settlement amount); *Helmick*, 2010 U.S. Dist. LEXIS 65808, at *6 (approving a service award that amounted to 11.1% of the gross settlement amount); *Newbanks v. Cellular Sales of Knoxville, Inc.*, No. CV 3:12-1420-CMC, 2015 WL 12843763, at *7 (D.S.C. Feb. 4, 2015) (approving service awards totaling 2.9% of the gross settlement amount).

Here, due to Named Plaintiff's efforts, counsel for Plaintiff negotiated a Gross Settlement Amount totaling $495,000.00.

**C.** **The Attorneys' Fees and Expenses Requested Are Reasonable and Warrant This Court's Approval.**

The FLSA contains a mandatory fee-shifting provision, which provides that "the court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b). The goal of a statutory award of attorneys' fees and costs is to "ensure access to the judicial process for persons with civil rights grievances." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983). For purposes of recovery of attorneys' fees and costs, a "prevailing party" is one who has "succeed[ed] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Id.*

Plaintiff seeks an award of 33.33% (one-third) of the Gross Settlement Fund ($495,000.00) as attorneys' fees or ($165,000), plus their costs and expenses of $3,108.31. As explained below, because the percentage method is preferred for awarding attorneys' fees in common fund cases in the Fourth Circuit, and because the award in this matter is reasonable under the *Barber* factors, this court should approve the requested award for Plaintiffs' attorneys' fees.

1. *The Percentage Method is Preferred for Awarding Attorneys' Fees in Common Fund Cases in the Fourth Circuit.*

The Supreme Court has long recognized that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (citations omitted). "The common fund doctrine is grounded in the belief that to deny attorneys a recovery of their fees from the funds they helped create would

unjustly enrich the class members at the expense of their attorneys and representatives."

*In re Microstrategy, Inc.*, 172 F. Supp. 2d 778, 784 n.16 (E.D. Va. 2001) (citing *Boeing*, 444 U.S. at 478). Where relatively small claims can only be prosecuted through aggregate litigation, and the law relies on prosecution by "private attorneys general," attorneys who fill that role must be adequately compensated for their efforts. *See Latham v. Branch Banking & Tr. Co.*, 2014 U.S. Dist. LEXIS 16490, at *7 (M.D.N.C. Jan. 14, 2014) ("[f]ee awards in wage and hour cases are meant to encourage members of the bar to provide legal services to those whose wage claims might otherwise be too small to justify the retention of able, legal counsel," and awarding $450,000 in attorney's fees, from a total settlement of $1,800,000, although the lodestar amount was only $246,485).

Although the lodestar method and the percentage of the fund method are both available, the trend in this Circuit is to use the percentage of the fund method in common fund cases like this one. *See Phillips v. Triad Guar., Inc.*, 2016 U.S. Dist. LEXIS 60950, at *5 (M.D.N.C. May 9, 2016); *Jones v. Dominion Res. Servs.*, 601 F. Supp. 2d 756, 758 (S.D. W. Va. 2009); *see also Hess v. Sprint Communs. Co. L.P.*, 2012 U.S. Dist. LEXIS 168963, at *6 (N.D.W. Va. Nov. 26, 2012) (collecting cases within the Fourth Circuit using the percentage method); Federal Judicial Center, Manual for Complex Litigation (Fourth) § 14.121 at 187 ("After a period of experimentation with the lodestar method . . . the vast majority of courts of appeals now permit or direct district courts to use the percentage-fee method in common-fund cases.").

There are several reasons that courts prefer the percentage method. First, the percentage method "better aligns the interests of [collective] counsel and [collective]

members because it ties the attorneys' award to the overall result achieved rather than the hours expended by the attorneys." *Jones*, 601 F. Supp. 2d at 759; *see also Phillips*, 2016 U.S. Dist. 60950, at \*6 (stating that the percentage method is preferred because it "closely associates the attorneys' fees with the overall result achieved."); *Hess*, 2012 U.S. Dist. LEXIS 168963, at \*7; *In re Wachovia Corp. ERISA Litig.*, 2011 U.S. Dist. LEXIS 123109, at \*16 (W.D.N.C. Oct. 24, 2011).

Second, the percentage of the fund method promotes early resolution and removes the incentive for plaintiffs' lawyers to engage in wasteful litigation in order to increase their billable hours. *See Jones*, 601 F. Supp. 2d at 759 ("[W]hen the lodestar method is applied, [collective] counsel has an incentive to 'over-litigate' or draw out cases in an effort to increase the number of hours used to calculate their fees."); *In re Wachovia*, 2011 U.S. Dist. LEXIS 123109, at \*16 (noting that the percentage method promotes efficiency); *In re Microstrategy, Inc.*, 172 F. Supp. 2d at 787 (same).

Third, the percentage method preserves judicial resources because it "is more efficient and less burdensome than the traditional lodestar method." *See Fangman v. Genuine Title, LLC*, 2016 U.S. Dist. LEXIS 160434, at \*14 (D. Md. Nov. 18, 2016); *Savani v. URS Prof'l Sols. LLC*, 121 F. Supp. 3d 564, 569 (D.S.C. 2015); *Strang v. JHM Mortg. Sec. Ltd. P'ship*, 890 F. Supp. 499, 503 (E.D. Va. 1995). The "primary source of dissatisfaction [with the lodestar method] was that it resurrected the ghost of Ebenezer Scrooge, compelling district courts to engage in a gimlet-eyed review of line-item fee audits." *Goldberger v. Integrated Res. Inc.*, 209 F.3d 43, 48-49 (2d Cir. 2000). While courts still use the lodestar method as a "cross check" when applying the percentage of the

fund method, they are not required to scrutinize the fee records as rigorously. *See Hall v. Higher One Machs., Inc.*, 2016 U.S. Dist. LEXIS 131009, at *20 (E.D.N.C. Sep. 26, 2016); *Phillips*, 2016 U.S. Dist. LEXIS 60950, at *6-7; *In re Wachovia*, 2011 U.S. Dist. LEXIS 123109, at *16; *Smith v. Krispy Kreme Doughnut Corp.*, 2007 U.S. Dist. LEXIS 2392, at *9 (M.D.N.C. Jan. 10, 2007).

Thus, given the advantage and preference of using the percentage method in the Fourth Circuit, this court should approve a 33.33% award of Plaintiffs' attorneys' fees in this matter.

2.   *The Barber Factors Support an Award of 33% of the Fund.*

Reasonableness is the touchstone for determining attorneys' fees. *See Robinson v. Harrison Transp. Servs., Inc.*, 2016 U.S. Dist. LEXIS 86294, at *13-14 (E.D.N.C. June 30, 2016); *Morris v. Cumberland Cty. Hosp. Sys.*, 2013 U.S. Dist. LEXIS 165063, at *12 (E.D.N.C. Nov. 13, 2013). The Supreme Court has opined that consensual resolution of attorney's fees, as was achieved by the parties in this action, is ideal. *See Hensley*, 461 U.S. at 437 ("A request for attorney's fees should not result in a second major litigation. Ideally of course, litigants will settle the amount of the fee."). Furthermore, the reasonableness of an award can be deduced by evidence of an arm's-length negotiation. *See Berry*, 807 F.3d at 618-19 (recognizing that the court may approve a fee request when there is "no reason to think that class counsel left money on the table in negotiation[s]" and there is a "lack of objection [from collective members] to the fee request"). While some courts within the Fourth Circuit have noted that "the percentage method, in addition to the absence of any objection to the fee award, obviates the need for an exhaustive review" of factors showing

the reasonableness of a fee award, *see Manuel v. Wells Fargo Bank, N.A.*, 2016 U.S. Dist. LEXIS 33708, at *14 (E.D. Va. Mar. 15, 2016), in *Barber*, the Fourth Circuit articulated twelve factors for courts to consider in determining the reasonableness of fee applications:

(1) the time and labor expended by counsel;

(2) the novelty and difficulty of the questions raised;

(3) the skill required to properly perform the legal services rendered;

(4) the attorney's opportunity costs in pressing the instant litigation;

(5) the customary fee for like work;

(6) the attorney's expectations at the outset of the litigation;

(7) the time limitations imposed by the client or circumstances;

(8) the amount in controversy and the results obtained;

(9) the experience, reputation and ability of the attorney;

(10) the undesirability of the case within the legal community in which the suit arose;

(11) the nature and length of the professional relationship between attorney and client; and

(12) attorney's fee awards in similar cases.

*Barber v. Kimbrell's*, 577 F.2d 216, 226 n.28 (4th Cir. 1978). All of the *Barber* factors weigh in favor of granting approval of Collective Counsel's fee application.

   a) <u>Collective Counsels' Time and Labor Expended (Barber Factor 1).</u>

 According to the Supreme Court, "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the

litigation," provided that there is a "good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 433-34.

### (1) Initial Investigation of Named Plaintiff and Initial Briefing

From the initial stages of case evaluation and discovery, Collective Counsel spent significant effort to achieve the $495,000.00 settlement. Before the initiation of this action, Collective Counsel conducted a thorough investigation into the merits of the potential claims and defenses. (Hernandez Decl. ¶¶ 14-15). This effort included investigation and legal research on the underlying merits of the collective claims, the likelihood of obtaining liquidated damages and an extended FLSA statute of limitations, the proper measure of damages, the likelihood of collective certification, and relevant history of litigation of the parties involved. *Id*. Plaintiffs' Counsel also conducted in-depth interviews with the named and opt-in Plaintiffs, for a total of about thirty-two (32) Plaintiffs, to determine the hours that they individually worked, the number of hours that they worked for which they were not paid, their rate of pay, approximately how many hours they worked per day and/or per week, and other information relevant to their claims. *Id*. ¶ 15. Plaintiffs' Counsel also obtained and reviewed numerous documents from named and opt-in Plaintiffs related to their employment with Defendant, including pay records and other related documents. *Id*.

### (2) Substantial Briefing on Plaintiffs' Motion for Conditional Certification and Subsequent Notice Period

There was also extended briefing and argument concerning Plaintiffs' Unopposed

Motion for Conditional Certification pursuant to the FLSA, which Plaintiff filed on March 28, 2019. Hernandez Decl. ¶ 50; *see also* Dkts. 52, 55. This involved an extensive series of declarations and discovery response documentation from defendant and plaintiffs. *Id*. Eventually, Plaintiffs prevailed on the motion, and conditional collective certification was granted on April 5, 2019. *See* Dkt. 55. This Court also granted Plaintiff's proposed notice, including, but not limited to a ninety (90) day notice period for FLSA putative Plaintiffs to file Consents to File Suit as Plaintiffs. As of November 25, 2019, approximately 66 FLSA opt-in Plaintiffs have filed Consents to File Suit. *Id.*

### (3)    The Parties' Settlement Negotiations

On September 27, 2019, the Parties participated in mandatory mediation whereby Plaintiff engaged in a damages analysis pursuant to data produced by Defendant as part of the Parties' discovery obligations. Defendant produced weekly pay records, start and end dates, and other compensation data for every FLSA Collective Member, at that time. Plaintiffs and Defendant submitted a mediation statement to the mediator. The Parties attended mediation before mediator Kenneth P. Carlson, Jr., at Collective Counsel's law offices in Cary, North Carolina. Following continued negotiations in the days following, mediation resulted in the Parties' Settlement Agreement, which has been submitted for Court approval.

On October 9, 2019, the parties filed a joint notice to advise the Court that the parties had reached an agreement to resolve named and opt-in Plaintiffs' claims, under the FLSA. Dkt.55.

26

### (4) Post-Mediation Work

After the mediation, Plaintiffs' counsel had considerable work to complete, including drafting and negotiating with Defendant over the text of the 27-page settlement agreement, drafting this motion for approval of the settlement, approval of the service award, approval of fees, and related documents.

In performing these tasks, Collective Counsel expended over 699 hours of attorney, paralegal, and staff member time – resulting in an aggregate lodestar of approximately $178,041.67. (Hernandez Decl.¶¶ 43). Collective Counsel believe these hours are reasonable for a case like this one and compiled them from contemporaneous time records maintained by each attorney, paralegal, and support staff participating in the case. ( Hernandez Decl. ¶ 44).

Moreover, the requested fee is not based solely on time and effort already expended, rather, it is also meant to compensate Plaintiffs' Counsel for time that will be spent administering the settlement in the future. Hernandez Decl. ¶¶ 45-46; *see ECOS, Inc. v. Brinegar*, 671 F. Supp. 381, 400-01 (M.D.N.C. 1987) ("[T]he court recognizes that . . . attorneys reasonably expended additional time seeking fees, in this action, for which an award is not requested. It is proper that the fee award compensate all of the time reasonably spent in this litigation . . . ."); *In re Montgomery Cty. Real Estate Antitrust Litig.*, 83 F.R.D. 305, 323 (D. Md. 1979) (designating a fund to be "set aside from the settlement fund against which attorneys may apply for fees for time expended in administering the settlement."); *see also Reyes v. Altamarea Grp.*, 2011 U.S. Dist. LEXIS 115984, at *23 (S.D.N.Y. Aug. 16, 2011) ("The fact that [c]lass [c]ounsel's fee award will not only compensate them for time

and effort already expended, but for time that they will be required to spend administering the settlement going forward also supports their fee request" of 33% of the fund.).

In Collective Counsel's experience, administering collective settlements of this nature and size requires a substantial and ongoing commitment. Hernandez Decl. ¶ 45-46. For example, Collective Counsel anticipate that Collective Counsel and staff will be required to respond to dozens of inquiries from collective members about the terms of the settlement and the amount of their settlement award. *Id.* at ¶ 45-46. As is common in wage and hour class and collective actions, Collective Counsel expects to respond to more Collective Member inquiries after approval of the settlement, especially after checks are issued. *Id.*

        b)    <u>The Novelty and Difficulty of the Questions Raised (Barber Factor 2).</u>

Cases raising novel and complex issues warrant a higher fee award. *See Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 180 (4th Cir. 1994); *Stocks v. Bowen*, 717 F. Supp. 397, 403 (E.D.N.C. 1989). Courts have recognized that wage and hour cases involve complex legal issues. *See, e.g., Barrentine v. Ark.-Best Freight Sys.*, 450 U.S. 728, 743 (1981) ("FLSA claims typically involve complex mixed questions of fact and law -- e. g., what constitutes the 'regular rate,' the 'work-week,' or 'principal' rather than 'preliminary or postliminary' activities. These statutory questions must be resolved in light of volumes of legislative history and over four decades of legal interpretation and administrative rulings."); *DeWitt*, 2013 U.S. Dist. LEXIS 172624, at *31 ("In the [c]ourt's experience, overtime cases under the Fair Labor Standards Act can be very complex and difficult,

involving the interaction among various statutes, regulations, and evolving case-law."); *Kirkpatrick*, 2018 WL 6718948, at *4 ("the novelty and difficulty of the questions raised weigh in favor of approving the fee because collective counsel had to address procedurally and substantively complex FLSA issues."); *Faile v. Lancaster Cty.*, 2012 U.S. Dist. LEXIS 189610, at *33 (D.S.C. Mar. 8, 2012) (same).

In this case, the requested fee amount is reasonable in consideration of the nature and difficulty of the responsibility assumed by Collective Counsel, as well as the questions of law. The parties litigated and submitted various statements, documents, and arguments relating to discovery disputes, Plaintiff's motion for conditional certification, statutory and administrative interpretations, and appropriate overtime rates. Additionally, Collective Counsel researched and drafted numerous submissions to Defendant and the mediator regarding a number of complex disputes, on topics including, but not limited to, Defendant's payroll policies and practices, liquidated damages, and willfulness. Collective Counsel also had to assess and analyze over 10,000 pages of payroll records.

Moreover, the magnitude of this case—involving over 66 collective members—is significant and adds to the complexity.

c) The Skill Required to Properly Perform the Legal Services Rendered (Barber Factor 3).

Attorneys' fees may be increased based on the particular skills and experience required to litigate a claim. *See Vincent v. Lucent Techs., Inc.*, 2011 U.S. Dist. LEXIS 123780, at *12 (W.D.N.C. Oct. 25, 2011) (finding that attorneys' fees were reasonable in light of the complexity of the relevant federal laws). "Employment law is a very dynamic

29

area of the law, requiring counsel to stay abreast of developments in both state and federal law. Moreover, as with any litigation in federal court, attorneys in overtime cases must be thoroughly familiar with developments and changes in the Federal Rules of Civil Procedure . . . ." *DeWitt*, 2013 U.S. Dist. LEXIS 172624, at *31. In particular, "the skill required to properly perform the legal services rendered weighs in favor of approving the fee because FLSA collective actions involve law which changes regularly due to growing jurisprudence across the country." *Kirkpatrick*, 2018 WL 6718948, at *4. The claims alleged here required sophisticated collective action experience by Collective Counsel. Having counsel well-versed in complex collective action practice was critical to the successful prosecution of this case. Collective Counsel has experience litigating wage and hour cases such as this, including several cases involving hundreds or thousands of class members, employees misclassified as exempt, and employees subject to improper overtime rates. *See* Hernandez Decl. ¶¶ 8-9. Collective Counsel in this action brought a wealth of knowledge and expertise to this case, as outlined below, and such knowledge and experience was necessary to litigate and settle this matter.

        d)    Collective Counsels' Opportunity Costs in Pursuing the Litigation (Barber Factor 4).

Courts consider the contingency of the litigation to determine the "opportunity costs or preclusion from other employment." *Lewis v. J.P. Stevens & Co.*, 1988 U.S. App. LEXIS 19610, at *10 (4th Cir. June 9, 1988); *see also Gilbert LLP v. Tire Eng'g & Distrib., LLC,*, 2017 U.S. App. LEXIS 8530, at *12 (4th Cir. May 15, 2017) ("Contingency agreements transfer a significant portion of the risk of loss to the attorneys."); *Goodman v.*

*Phillip R. Curtis Enters., Inc.*, 809 F.2d 228, 235 (4th Cir. 1987) (same). Collective Counsel undertook to prosecute this action without any assurance of payment for their services, litigating this case on a wholly contingent basis in the face of significant risk. Hernandez Decl. ¶ 46. Collective wage and hour cases of this type are, by their very nature, complicated and time-consuming. *Id.* Any lawyer undertaking representation of large numbers of affected employees in such actions inevitably must be prepared to make a tremendous investment of time, energy, and resources. *Id.* Due also to the contingent nature of the customary fee arrangement, lawyers are asked to be prepared to make this investment with the very real possibility of an unsuccessful outcome and no fee of any kind. *Id.* Plaintiff's Counsel stood to gain nothing in the event the case was unsuccessful. *Id.* Accordingly, the opportunity costs in this action, requiring a large investment of time, energy, and resources, with no guarantee of success, were significant.

Moreover, the size of Collective Counsel's practice, and the time demands of the litigation, may support this *Barber* factor and/or increase attorneys' fees for a prevailing plaintiff. *See DeWitt*, 2013 U.S. Dist. LEXIS 172624, at *32 (stating that where counsel documented over 187 hours, "represent[ing] a significant opportunity cost for an attorney . . . in terms of other cases that could have been handled during the same period," and where counsel "advanced all of the costs of this litigation," the opportunity costs factor was satisfied); *Vincent*, 2011 U.S. Dist. LEXIS 123780, at *13 ("[D]ue to . . . the small size of the firm of Plaintiff's attorneys, and the finite resources of such firm, acceptance of this Plaintiff's case resulted in the inability to accept other paying work," constituting significant opportunity costs); *Johannssen v. Dist. No. 1 - Pac. Coast Dist., MEBA Pension*

*Plan*, 2001 U.S. Dist. LEXIS 10556, at *13 (D. Md. July 10, 2001) ("The extensive time spent on this case could certainly have been spent handling other cases; thus, involvement in this litigation carried with it significant opportunity costs."). In this matter, Collective Counsel is composed of three attorneys at a single firm, and they spent over 699 hours litigating and settling this action with many more hours which shall be spent with managing the settlement administration, and responding to calls after the distribution of notice, and later the checks, take place. *See* Hernandez Decl. ¶¶ 43-46. The opportunity costs in this litigation, accordingly, are certainly significant.

### e) The Customary Fee for Like Work (Barber Factor 5).

To satisfy its burden under the *Barber* factors, the plaintiff must "present the Court with adequate evidence of the prevailing rates in the relevant market." *Plyer v. Evantt*, 902 F.2d 273, 277 (4th Cir. 1990). "While evidence of fees paid to attorneys of comparable skill in similar circumstances is relevant, so too is the rate actually charged by the petitioning attorneys when it is shown that they have collected those rates in the past from the client." *Caperton*, 31 F.3d at 175. In a recent decision displaying customary fees charged, reached on June 30, 2017, a Court in this state approved attorneys' fees and expenses of $3.8 million, for an FLSA/NCWHA hybrid collective/class action, that settled for a total of $9 million. *See Rehberg v. Flowers Baking Co. of Jamestown, LLC*, No. 3:12-cv-00596, Dkt. 250 (W.D.N.C. June 30, 2017). In doing so, the court approved all of the following hourly rates for all attorneys who participated in that matter: $975 per hour (partner); $850 per hour (partner); $850 per hour (partner); $795 per hour (partner); $795 per hour (partner); $780 per hour (partner); $700 per hour (associate); $695 per hour

(partner); $590 per hour (partner); $550 per hour (partner); $550 per hour (partner); $525 per hour (associate); $525 per hour (partner); $500 per hour (associate); $475 per hour (associate practicing since 2015); $450 per hour (associate practicing since 2014); $450 per hour (associate practicing since 2014); $450 per hour (associate practicing since 2014); $400 per hour (associate practicing since 2013); and $375 per hour (associate). *See id.* Dkts. 245-1, 245-2, 245-3, 245-4, 245-5, 250.

Here, as described above, and assessed below for the ninth *Barber* factor (experience, reputation, and ability of the attorney), Collective Counsel have extensive North Carolina and national wage and hour experience, including in complex collective and class action lawsuits. *See infra.* Collective Counsel's current rate, $650 per hour, fall to the lower end of customary rates for an experienced partner's participation in FLSA actions. *Id.* Since 2013, when the GAH law practice was launched, Collective Counsel Hernandez's hourly rate has increased by only 10%, from $595 to $650, which is a proportionate increase as compared to the firm's growth, demand, and increased experience. Hernandez Decl. ¶ 40. To that end, Collective Counsel's customary rates have been previously approved by other courts. *See, e.g., Berber v. Hutchison Tree Serv.,* No. 5:15-CV-143-D, Dkt. 127 (E.D.N.C. May. 29, 2019) (granting final approval of Plaintiffs' Counsel's fees); *In re Gentiva Health Services Inc.*, No: 1:14-cv-01892-WBH, Dkt. 113 (N.D. Ga. June 22, 2017) (approving GAH's then $595 rate as the basis of a lodestar crosscheck for a common fund award that was approved by the court in nationwide action); *Tomkins v. Amedisys*, No. 3:12-cv-1082 (D. Conn. 2016) (approving GAH's then $595 rate as the basis of a lodestar crosscheck for a common fund award that

was approved by the court in nationwide action); *McLaurin v. Prestage Foods*, 2012 U.S. Dist. LEXIS 13086 (E.D.N.C. Feb. 3, 2012) (same, at the then-charged lower rate of $385 per hour, charged while counsel was a firm associate, not owner, and before attaining an additional seven years of collective/class action experience both locally and in nationwide actions, and stating, "[T]he court [allows] the motion for attorneys' fees and awards attorneys' fees . . . . [t]he court finds this amount to be reasonable in light of the complexity of the case, the history of the litigation, and the results obtained."). As such, Collective Counsel's fees are consistent with the customary fee for like work and satisfy the fifth factor of *Barber*.

f) <u>Collective Counsel's Expectations at the Outset of Litigation (Barber Factor 6).</u>

According to the Supreme Court, "[t]he fee quoted to the client or the percentage of the recovery agreed to is helpful in demonstrating the attorney's fee expectations when [she] accepted the case." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 723 (1987) (citations omitted). "Courts have generally recognized that a contingent fee lawyer may have the right to expect a fee greater than if [her] fee were guaranteed." *Va. Acad. of Clinical Psychologists v. Blue Shield of Va.*, 543 F. Supp. 126, 148 (E.D. Va. 1982). Because Collective Counsel represented Plaintiff on a contingency basis, Collective Counsel took on significant risk of non-payment, the burden of advancing litigation expenses, and the substantial opportunity cost of having to turn down other potentially lucrative work. These large risks strongly motivated Collective Counsel to perform work of the highest quality and in appropriate quantity, in order to fulfill their

commitment to the collective. Defendant's counsel also litigated this case vigorously, which in turn, increased the time and energy required by Collective Counsel to prosecute the case to a successful conclusion. This case, because of its contingent nature and the challenges it posed to counsel on both sides, presented a high-stakes proposition justifying the attorney's fee request, consistent with Collective Counsel's expectations.

g) <u>The Time Limitations Imposed by the Client or Circumstances (Barber Factor 7).</u>

Priority work that takes time away from the lawyer's other legal work is entitled to some premium. *See In re Steel Network, Inc.*, 2011 Bankr. LEXIS 3418, at *34 (U.S. Bankr. M.D.N.C. June 27, 2011); *Va. Acad. of Clinical Psychologists*, 543 F. Supp. at 148-49; *see also Hyatt v. Heckler*, 586 F. Supp. 1154, 1158 (W.D.N.C. 1984). This case involved discovery, declarations, and filings which necessarily involved strict time limitations, as well as extensive pre-mediation research and review of documents within a short period of time. *See supra*. These time limitations frequently required Collective Counsel to take time away from other matters and devote substantial resources to particular deadlines. *See O'Bryhim v. Reliance Standard Life Ins. Co.*, 997 F. Supp. 728, 734 (E.D. Va. 1998), *aff'd*, 188 F.3d 502 (4th Cir. 1999) ("Due to the numerous motions and court appearances, there were frequent time limitations in this case."). This factor thus supports a premium on counsel's fee.

h) <u>The Amount in Controversy and the Results Obtained (Barber Factor 8).</u>

In the Fourth Circuit, "the most critical factor in calculating a reasonable fee award is the degree of success obtained." *Randle v. H&P Capital, Inc.*, 513 F. App'x 282, 284

(4th Cir. 2013) (citing *Farrar v. Hobby*, 506 U.S. 103, 114 (1992)); *Lilly v. Harris-Teeter Supermarket*, 842 F.2d 1496, 1511 (4th Cir. 1988) (citing *Hensley*, 461 U.S. at 434-37). Success warranting attorneys' fees occurs when the moving party "achieves some of the benefit the parties sought in bringing the suit." *Arvinger v. Mayor and City Council of Baltimore*, 31 F.3d 196, 200 (4th Cir. 1994).

In this case, Collective Counsel obtained significant success on behalf of Plaintiffs. In terms of recovery, the collective is obtaining substantial benefits. A settlement of $495,000.00 for alleged unpaid overtime is significant. Indeed, $495,000.0[1] is potentially more than one-third of the estimated total lost wages when actual damages were calculated at approximately $1.5 million, (assuming a three-year period of damages and at time and one-half calculated for hours over forty per week as opposed to Defendant's asserted half-time basis). As such, these assumptions are not automatic, as they would require significant litigation. The certainty of receiving a high proportion of lost wages now is worth more to collective members than the chance that they might – or might not – recover 100% of their losses at some point in the future. The relief obtained under the FLSA is excellent in light of the defenses likely to be faced at trial and the risk of decertification.

---

[1]In fact, Collective Counsel's efforts resulted in more money than the USDOL's back wage finding of $278,000 for approximately 80 employees. Here, Collective Counsel secured a higher return on damages for a smaller class, (in light of approximately 66 plaintiffs choosing to participate in the action). More significantly, Collective Counsel also secured injunctive relief by negotiating a prospective change of Duplin County's pay practice *from a fluctuating salary with overtime pay at half-time for hours over 40, to an hourly basis compensation practice and overtime pay at time and one-half for hours over 40 per week, which will commence on December 21, 2019*. Collective Counsel's efforts have provided significant positive changes for Duplin County's EMS and EMT employees.

Accordingly, the results obtained have been excellent, particularly when viewed along with the risks and uncertainties of continuing to litigate this matter.

i) The Experience, Reputation, and Ability of the Attorneys (Barber Factor 9).

To determine the ninth *Barber* factor, courts review, among other things, attorneys' "expertise in complex litigation . . . [and] history of success in difficult, high-stakes litigation." *LandAmerica 1031 Exch. Servs. v. Chandler*, 2012 U.S. Dist. LEXIS 159630, at *17 (D.S.C. Nov. 7, 2012); *see also Braun v. Culp, Inc.*, 1985 U.S. Dist. LEXIS 20373, at *8 (M.D.N.C. Apr. 26, 1985). Collective Counsel believe the recovery obtained was substantial. Defendant agrees to pay a total of $495,000.00 to settle this litigation. Weighing the benefits of the settlement against the risks associated with proceeding in the litigation, Collective Counsel therefore assert the settlement is reasonable. The settlement amounts will be available to collective members without the uncertainty and delay of trial or appeal.

Collective Counsel has substantial experience prosecuting large-scale wage and hour class and collective actions. Hernandez Decl. ¶¶ 8-9 (listing GAH's substantial experience with wage and hour actions and listing cases). Collective Counsel's skill and experience litigating wage and hour cases contributed to obtaining the settlement and weigh in favor of granting the requested fees. *Id.*; *see also Mackey v. Stetson*, 1981 U.S. Dist. LEXIS 16768, at *6 (W.D.N.C. Sep. 21, 1981) (holding that lead counsel's experience representing plaintiffs in class actions "justifies an upward adjustment in the award.").

37

j)    The Undesirability of the Case Within the Legal Community in Which the Suit Arose (Barber Factor 10).

Courts in this Circuit may enhance attorneys' fees "when the prevailing party can establish that, absent an adjustment, [the plaintiffs] 'would have faced substantial difficulties in finding counsel in the local or other relevant market.'" *Lewis*, 1988 U.S. App. LEXIS 19610, at *11 (quoting *Delaware Valley*, 482 U.S. at 731 (1987)). Lawsuits that are undesirable, either because of novelty of the issue or difficulty of the litigation, are eligible for premium attorneys' fees. *See Alexander v. Hill*, 625 F. Supp. 567, 570 (W.D.N.C. 1985) (considering that the case in question was "frustrating and thankless and require[d] great dedication" as the basis for an upward adjustment in attorneys' fees); *Mackey*, 1981 U.S. Dist. LEXIS 16768, at *6 (stating the fact that "not all lawyers are willing to handle" a certain type of case, warrants "[a]n upward adjustment . . . to reward plaintiffs' counsel's willingness to handle th[e] case, and to encourage others to do so in the future."); *see also Price v. City of Fayetteville*, 2015 U.S. Dist. LEXIS 32577, at *14 (E.D.N.C. Mar. 17, 2015) ("In light of the difficult . . . legal issues presented by this case, in addition to the challenges in development of the factual record, without guarantee of success or attorney fees, plaintiffs have demonstrated the undesirability of the case within the North Carolina, legal community in which the suit arose.").

Relevant to this factor in this matter is that Collective Counsel took this complex, expensive, and time-consuming case on a contingency basis, with no guarantee of payment, unless the litigation was successfully resolved by settlement or judgment. Collective Counsel brought this case knowing they would face vigorous, hard-fought litigation from

38

highly-motivated opponents and high-caliber defense attorneys. The GAH Collective Counsel is also the only firm, not only in Wake County, but in the State of North Carolina, that practices *exclusively* wage and hour law, pursuant to the FLSA and NCWHA, giving Collective Counsel a far greater degree of expertise and experience than other attorneys. These factors would render this case undesirable to many attorneys and, accordingly, this factor supports the fee request here.

> k)  The Nature and Length of the Professional Relationship Between Attorney and Client (Barber Factor 11).

A first-time, one-time, and/or contingency relationship may render this factor irrelevant from the attorneys' fee analysis, and therefore inconsequential. *See Price*, 2015 U.S. Dist. LEXIS 32577, at *14-15; *DeWitt*, 2013 U.S. Dist. LEXIS 172624, at *35; *Bunn v. Bowen*, 637 F. Supp. 464, 472 (E.D.N.C. 1986). In contrast, an on-going relationship with a client who brings repeat business to a firm tends to lead to lower hourly rates. *Norman v. Housing Authority of City of Montgomery*, 836 F.2d 1292, 1300, 1305 (11th Cir. 1988); *Duckworth v. Whisenant*, 97 F.3d 1393, 1396 (11th Cir. 1996). In situations such as this, with a one-time retention not likely to lead to repeat business from the same client, rates should be higher than what firms obtaining repeat business charge.

> l)  Attorneys' Fees Awards in Similar Cases (Barber Factor 12).

Courts also consider the size of the settlement to ensure that the percentage awarded does not constitute a "windfall." *See, e.g.*, *McAfee v. Boczar*, 738 F.3d 81, 92 (4th Cir. 2013); *Norwood v. Charlotte Mem'l Hosp. & Med. Ctr.*, 720 F. Supp. 543, 546 (W.D.N.C. 1989). The percentage used in calculating a given fee award may follow a sliding-scale

39

and may bear an inverse relationship to the amount of the settlement. *See Goldenberg v. Marriott PLP Corp.*, 33 F. Supp. 2d 434, 438 (D. Md. 1998). Where the size of the fund is relatively small, courts typically find that requests for a greater percentage of the fund are reasonable. *See, e.g.*, *id.* (citing *In re First Fidelity Bancorporation Sec. Litig.*, 750 F. Supp. 160 (D.N.J. 1990), where the court awarded 30% of first $10 million, 20% of next $10 million, 10% of any recovery greater than $20 million).

The size of the proposed $495,000.00 million settlement weighs in favor of granting the requested fee award of 33.33% of the common fund. Numerous courts in this Circuit have granted requests for approximately one-third of the fund in cases with settlement funds significantly higher than this one. *See, e.g.*, *Thomas v. FTS USA, LLC*, 2017 U.S. Dist. LEXIS 45217, at *15 (E.D. Va. Jan. 9, 2017) (approving a one-third fee of a $1.3 million settlement, plus $50,000 in costs, and finding that "a fee award of one-third of the settlement fund would be consistent with that awarded in other cases."); *Hackett v. ADF Rest. Invs.*, 2016 U.S. Dist. LEXIS 174775, at *14-17 (D. Md. Dec. 16, 2016) (approving class counsel one-third of settlement); *Phillips*, 2016 U.S. Dist. LEXIS 60950, at *29 (approving a 30% fee award on a $1.6 million settlement, plus over $100,000 in expenses); *McClaran v. Carolina Ale House Operating Co.*, LLC, 2015 U.S. Dist. LEXIS 112985, at *11 (D.S.C. Aug. 26, 2015) ("In a number of [wage and hour] cases, courts found that a fee award of one-third of the settlement fund was reasonable."); *Archbold v. Wells Fargo Bank, N.A.*, 2015 U.S. Dist. LEXIS 92855, at *13 (S.D. W. Va. July 13, 2015) (same); *Kirven v. Cent. States Health & Life Co.*, 2015 U.S. Dist. LEXIS 36393, at *34 (D.S.C. Mar. 23, 2015) (same); *Decohen v. Abbasi, LLC*, 299 F.R.D. 469, 482 (D. Md. 2014)

40

(approving a one-third award because of the contingency fee basis, complexity of the matter, and risk); *McDaniels v. Westlake Servs., LLC*, 2014 U.S. Dist. LEXIS 16081, at *38 (D. Md. Feb. 7, 2014) (same); *DeWitt*, 2013 U.S. Dist. LEXIS 172624, at *22 (same); *Faile*, 2012 U.S. Dist. LEXIS 189610, at *20 (same); *McLaurin*, 2012 U.S. Dist. LEXIS 13086, at *3 (approving one-third of a $1.8 million FLSA/NCWHA settlement for attorney's fees); *In re Red Hat, Inc. Sec. Litig.*, 2010 U.S. Dist. LEXIS 131249, at *3 (E.D.N.C. Dec. 10, 2010) (approving $6 million in attorney's fees from a $20 million settlement, equating to 30%); *Helmick v. Columbia Gas Transmission*, 2010 U.S. Dist. LEXIS 65808, at *15 (S.D. W. Va. July 1, 2010) ("[A] fee award in the amount of 33 1/3 % (one-third) is reasonable); *Hoffman v. First Student, Inc.*, 2010 U.S. Dist. LEXIS 27329, at *11 (D. Md. Mar. 23, 2010) (same); *Beaulieu v. EQ Indus. Servs.*, No. 5:06-CV-400-BR, Dkt. 427 (E.D.N.C. Dec. 23, 2009) (approving approximately $3 million in attorneys' fees, 38% of the settlement fund); *Smith*, 2007 U.S. Dist. LEXIS 2392, at *6 ("In this jurisdiction, contingent fees of one-third (33.3%) are common."); *see generally* Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. of Empirical Legal Studies, 27, 31-33 (2004) (finding that courts consistently award between 30% and 33% of the common fund in class action settlements); Newberg on Class Actions § 15:73 (5th ed.) (stating that most contingency agreements permit an attorney to receive one-third of his/her client's recovery).

### 3. *Public Policy Considerations.*

Plaintiffs also believe public policy considerations weigh in favor of granting Collective Counsel's requested fees. In rendering awards of attorneys' fees, courts within

the Fourth Circuit take into account the social and economic value of [complex] actions, "and the need to encourage experienced and able counsel to undertake such litigation." *See Phillips*, 2016 U.S. Dist. LEXIS 60950, at *26-27; *Jones*, 601 F. Supp. 2d at 760; *In re Wachovia*, 2011 U.S. Dist. LEXIS 123109, at *23. The FLSA is a remedial statute designed to protect the wages of workers. *See A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945) (referring to the FLSA's "remedial and humanitarian" purpose); *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 133 (4th Cir. 2017) (referring to the FLSA's "remedial and humanitarian" purpose) (citing *Tenn. C. v. Muscoda*, 321 U.S. 590, 597 (1944)). In order to achieve those remedial objectives and protect employees, courts recognize that adequate fee awards are essential for those who step forward to represent employees with wage and hour claims. *See Jackson v. Estelle's Place, LLC*, 391 F. App'x 239, 246 (4th Cir. 2010); *DeWitt*, 2013 U.S. Dist. LEXIS 172624, at *28.

4. *The Lodestar Cross Check Further Supports an Award to Plaintiffs' Counsel of One- Third of the Settlement Fund.*

Although the percentage method is preferred within the Fourth Circuit, courts still use the lodestar method to "cross check" the reasonableness of the fee percentage requested, though rigorous scrutiny of the fee records is not necessary. *See Hall*, 2016 U.S. Dist. LEXIS 131009, at *20; *Phillips*, 2016 U.S. Dist. LEXIS 60950, at *6-7. As part of the cross check, the lodestar is determined by multiplying the hours reasonably expended on the case by a reasonable hourly rate. *See In re Dollar Gen. Stores FLSA Litig.*, 2011 U.S. Dist. LEXIS 98162, at *10 (E.D.N.C. Aug. 22, 2011). Courts then consider whether a multiplier is warranted and reasonable based on the factors set out in *Barber*, as detailed

above.  *See Berry*, 807 F.3d at 617; *see also Barber*, 577 F.2d at 226; *Anselmo v. W. Paces Hotel Grp., LLC*, 2012 U.S. Dist. LEXIS 164618, at *11 (D.S.C. Nov. 19, 2012).

Collective Counsel's request for one-third of the proposed settlement Fund – $165,000.00 – is actually less than their calculated "lodestar."    Where supported by the relevant considerations, courts within the Fourth Circuit "have generally held that lodestar multipliers falling between 2 and 4.5 demonstrate a reasonable attorneys' fee." *See Jones*, 601 F. Supp. 2d at 766; *see, e.g., id.* (approving "a lodestar multiplier between 3.4 and 4.3 which is closer to the middle of the range considered reasonable by courts."); *Hatzey v. Divurgent, LLC,* 2018 U.S. Dist. LEXIS 187007, at *15-16 (E.D. Va. Oct. 9, 2018) (approving a multiplier of 6.4); *Fangman*, 2016 U.S. Dist. LEXIS 160434, at *36 (approving a multiplier of 5.6); *Nieman v. Duke Energy Corp.*, 2015 U.S. Dist. LEXIS 148260, at *5 (W.D.N.C. Nov. 2, 2015) (approving "an upward variance from a 4.5 multiplier"); *Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 689 (D. Md. 2013) (approving a multiplier of 3); *Deloach*, 2003 U.S. Dist. LEXIS 23240, at *38 (approving a 4.45 multiplier to a lodestar of approximately $16 million, bringing the fee award to approximately $70 million); *Goldenberg*, 33 F. Supp. 2d at 439 n.6 (approving a 3.6 multiplier, and stating that it was "well within the average range of 3-4.5 for comparable cases."). Multipliers which – like here – are less than 2, have been described as "modest." *Smith v. Krispy Kreme Doughnut Corp.*, 2007 WL 119157, at *1–3 (M.D.N.C. Jan. 10, 2007) (approving a "modest" multiplier of 1.6); *Kirkpatrick*, 2018 WL 6718948, at *5 (finding a multiplier of 1.8 "well within the normal range of lodestar multipliers); *Kruger v. Novant Health, Inc.*, No. 1:14CV208, 2016 WL 6769066, at *4–5 (M.D.N.C. Sept. 29,

43

2016) (approving a one-third fee of 3.69 times the lodestar).

Collective Counsel spent over  hours litigating and settling this matter.  Hernandez Decl. ¶ 43.  The time spent by Collective Counsel is  described in Collective Counsel's Declaration.  The hours Collective Counsel worked, at the rates set forth in the accompanying declaration, yields a lodestar calculated at approximately $178,041.67. Hernandez Decl. ¶ 43.  Moreover, Collective Counsel have incurred a total of approximately $3,058.91 in litigation expenses.[2]  Collective Counsel's lodestar and expenses will increase as the settlement progresses, including time required administering the settlement, answering collective member questions, ongoing long-distance communications with collective members and opt-in plaintiffs to discuss settlement payments before and after distribution of such payments, and any other miscellaneous expenses not anticipated.  Hernandez Decl. ¶¶ 45-46.  In light of the  fact that Collective Counsel will likely perform additional work after approval of the settlement, Collective Counsel's request is rendered even more reasonable and will approximate the lodestar amount.  *See ECOS*, 671 F. Supp. at 400-01; *In re Montgomery Cty.*, 83 F.R.D. at 323; *Reyes*, 2011 U.S. Dist. LEXIS 115984, at *23.

     5.    *Plaintiffs' Counsel Are Entitled to Reimbursement of Litigation Costs Under the Settlement  Agreement.*

Collective Counsel request reimbursement of $3058.91 in litigation costs to be paid from the Fund, in addition to fees.   Attorneys may be compensated for litigation expenses

---

[2] The litigation costs include mediation costs, travel, hotel, deposition and court hearing transcripts, postage and courier fees, transportation, working meals long distance, electronic research, photocopies, and other similar costs.

"reasonably incurred by counsel in prosecuting a class action." *See In Re Wachovia Corp.*, 2011 U.S. Dist. LEXIS 123109, at *30; *see also Smith*, 2007 U.S. Dist. LEXIS 2392, at *12-13; *Braun v. Culp, Inc.*, 1985 U.S. Dist. LEXIS 20373, at *13 (M.D.N.C. Apr. 26, 1985). Here, Collective Counsel's current expenses were incidental and necessary to the representation of the collective. Hernandez Decl. ¶ 47. These expenses include court fees, transcripts of depositions and hearings, the costs of issuing the Notice of settlement and short-form Releases, and copies and exemplification of necessary papers. *Id.*

## IV.   CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court grant his Unopposed Motion to Approve FLSA Settlement Agreement, Including Award of Attorneys' Fees and Costs, Service Award, And Integrated Memorandum In Support, and enter an Order: (i) approving the parties' Settlement Agreement; (ii) approving a gross settlement fund of $495,000; (iii) awarding Named Plaintiff Ryan Lang a Service Award in the amount of $15,000; (iv) awarding attorneys' fees in the amount of $165,000.00, which represents 33.33% of the Fund; (v) reimbursing $3058.91 in litigation expenses (to be paid from the Fund) that Collective Counsel incurred; and (vi) $4000.00 which represents the Settlement Administrator's cost to administer the settlement.

Respectfully submitted this November 25, 2019.

/s/ *Gilda Adriana Hernandez*
Gilda A. Hernandez (NCSB # 36812)
Charlotte C. Smith (NCSB # 53616)
**THE LAW OFFICES OF GILDA A.
HERNANDEZ, PLLC**
1020 Southhill Drive, Suite 130
Cary, NC 27513

45

Telephone: (919) 741-8693
Facsimile: (919) 869-1853
ghernandez@gildahernandezlaw.com
csmith@gildahernandezlaw.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2019, a true and correct copy of the foregoing **PLAINTIFF'S UNOPPOSED MOTION TO APPROVE FLSA SETTLEMENT AGREEMENT, INCLUDING AWARD OF ATTORNEYS' FEES AND COSTS, SERVICE AWARD, AND INCORPORATED MEMORANDUM IN SUPPORT** was delivered via the CM/ECF system to the following:

Norwood P. Blanchard, III
State Bar No. 26470
Crossley McIntosh Collier Hanley & Edes, PLLC
5002 Randall Parkway
Wilmington, NC 28403
norwood@cmclawfirm.com
Telephone: (910) 762-9711
Facsimile: (910) 256-0310

*Attorney for Defendant*

/s/ *Gilda Adriana Hernandez*
Gilda A. Hernandez (NCSB No. 36812)
Charlotte Smith (NCSB No. 53616)
**THE LAW OFFICES OF GILDA A. HERNANDEZ, PLLC**
1020 Southhill Drive, Ste. 130
Cary, NC 27513
Tel: (919) 741-8693
Fax: (919) 869-1853
ghernandez@gildahernandezlaw.com
csmith@gildahernandezlaw.com

*Attorneys for Plaintiff*